UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

A.D., *a minor, by her parents and next friends, E.D. and C.D.*,

                    Plaintiffs,

        v.

DISTRICT OF COLUMBIA,

                    Defendant.

Civil Action No. 20-cv-2765 (BAH)

Chief Judge Beryl A. Howell

**MEMORANDUM OPINION**

Following years of administrative proceedings and earlier litigation in this Court, plaintiffs—A.D., a District of Columbia ("District") resident eligible for special education, and her parents, E.D. and C.D.—have again filed suit under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C §§ 1400 *et seq.*, and move for summary judgment arguing that the District of Columbia Public Schools ("DCPS") denied A.D. a free appropriate public education ("FAPE") for the second half of the 2019-2020 school year.  Pls.' Mot. for Summ. J., ECF No. 18; Pls.' Mem. Supp. Mot. for Summ. J. ("Pls.' Mem."), at 1, ECF No. 18-1; *see also A.D., et al. v. Creative Minds Int'l Public Charter School, et al.* ("*A.D. I*"), No. 18-cv-2430 (CRC) (DAR), 2020 WL 6373329 (D.D.C. Sept. 28, 2020).  Before moving for summary judgment, plaintiffs sought—and this Court granted—preliminary injunctive relief pursuant to IDEA's "stay-put" provision, 20 U.S.C § 1415(j), which maintained A.D.'s current educational placement at a private school and ordered the District to provide both retroactive and prospective tuition reimbursement for that placement throughout the pendency of the instant proceedings.

1

*See generally A.D., et al. v. District of Columbia* ("*A.D. II*"), No. 20-cv-2765 (BAH), 2021 WL

354175 (D.D.C. Feb. 2, 2021); Order (Feb. 2, 2021), ECF No. 12.

Plaintiffs now challenge a September 2020 administrative decision upholding DCPS'

latest individualized education plan ("IEP"), providing, *inter alia*, twenty hours of specialized

instruction outside general education and proposing the public high school in A.D.'s

neighborhood as the educational center for implementation of the plan.  Pls.' Mem. at 2, 8, 14.

According to plaintiffs, DCPS did not sufficiently consider A.D.'s individualized needs in

crafting this IEP, and the September 2020 administrative ruling was "a severely flawed

[d]ecision" that failed to "reconcile the evidence at hearing [sic.]" and afforded "blind deference

to the school system without any explanation as to why."  *Id.* at 1.  The District has cross-moved

for summary judgment.  *See* Def.'s Opp'n Pls.' Mot. for Summ. J. & Cross-Mot. for Summ. J.,

ECF No. 20; Def.'s Mem. Supp. Opp'n Pls.' Mot. for Summ. J. & Cross-Mot. for Summ. J.

("Def.'s Mem."), ECF No. 20.[1]  For the reasons explained below, plaintiffs' motion is denied

and the District's cross-motion is granted.

I.      **BACKGROUND**

The statutory backdrop to the parties' dispute is described below, followed by the

relevant factual and procedural history.

A.  **Statutory Background**

Under IDEA, "states and territories, including the District of Columbia, that receive

federal educational assistance must establish 'policies and procedures to ensure,' among other

things, that 'free appropriate public education' . . .  is available to disabled children."  *Reid ex*

*rel. Reid v. District of Columbia*, 401 F.3d 516, 518 (D.C. Cir. 2005) (quoting 20 U.S.C. §

---

[1]      The memoranda filed in support of some of the parties' motions are docketed twice.  *See, e.g.*, ECF Nos.
20, 21, 23 and 24.  To simplify citation, only one of the duplicate memoranda will be referenced.

1412(a)(1)(A).  A "free and appropriate public education," or "FAPE," is delivered by local

education authorities through a uniquely tailored "'individualized education program,'" or "IEP."

*Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist.*, 137 S. Ct. 988, 993-994 (2017); *see also*

20 U.S.C §§ 1401(9)(D), 1412(a)(1).  To be IDEA-compliant, an IEP must reflect "careful

consideration of the child's individual circumstances" and be "reasonably calculated to enable

the child to receive educational benefits," *Endrew F.*, 137 S. Ct. at 994, 996 (cleaned up), "even

as it stops short of requiring public schools to provide the best possible education for the

individual child," *Z.B. v. District of Columbia*, 888 F.3d 515, 519 (D.C. Cir. 2018).  An IEP is

also required to "set[] out, in writing, the student's existing levels of academic and functional

performance, establish[] appropriate goals, and describe[] how the student's progress toward

those goals will be measured."  *Id.*  Moreover, it is "imperative that, to 'the maximum extent

appropriate,' public schools provide students with disabilities an education in the 'least

restrictive environment,'" *id.* at 528 (quoting 20 U.S.C. § 1412(a)(5)(A)), which, as recently

emphasized by the Supreme Court, "requires that children with disabilities receive education in

the regular classroom whenever possible," *Endrew F.*, 137 S. Ct. at 999.  An IEP failing to

satisfy these statutory directives may be remedied through an IDEA claim to the extent the IEP

"denies the child an appropriate education."  *Z.B.*, 888 F.3d at 519.

    When a public "school system fails to provide a student with an appropriate education

and such education is offered at a private school, the school system may be liable to reimburse

the student for the cost of private education."  *Id.*; *see also* 20 U.S.C. § 1412(a)(10)(C)(ii).

Compensatory awards, requiring "'educational services . . . to be provided prospectively to

compensate for a past deficient program,'" are also among the arsenal of remedies available

under the statute.  *Reid*, 410 F.3d at 522 (quoting *G. ex rel. RG v. Fort Bragg Dependent Schs.*, 343 F.3d 295, 308 (4th Cir. 2003)).

### B.  Factual Background

A.D. is a fifteen-year-old, educationally disabled student who currently attends The Lab School, a full-time, private school in Washington, D.C.  Admin. Record ("AR") at 543, 580, ECF Nos. 14-17.  A.D. has a diagnosis of dyslexia and specific learning disabilities in written expression and mathematics, and testing indicates her IQ is within "the high average range" and that she "is able to access the general curriculum" for her age group.  *Id.* at 820, 980, 982.  In 2012, when she was in second grade, A.D. was first found eligible for special education services. *Id.* at 37, 46, 103, 939-940.  From that initial evaluation to the present, A.D.'s parents have filed three separate due process complaints before the District's Office of Dispute Resolution for the State Superintendent of Education challenging a sequence of IEPs prepared for their daughter: two of these complaints resulted in modifications to her education program, while the third complaint was dismissed by an administrative hearing officer and prompted the instant lawsuit. *Id.* at 8-9, 11-13, 16.  This series of IEPs, due process complaints, and administrative proceedings is outlined below.

### 1.  *2016 IEP and First Due Process Complaint*

In January 2016, A.D., then in fifth grade and enrolled in Creative Minds International Public Charter School ("Creative Minds"), received an assessment of her cognitive abilities and academic functioning to determine her continued eligibility for special education services.  *Id.* at 37.  This evaluation found that A.D. continued to have a "specific learning disability in the area of writing," with her achievement scores in the average range for eight tests and low range for

two tests.[2]  *Id.* at 37, 47.  The evaluation further characterized A.D. as a student whose

"difficulties in her academic work are likely to be impacted by weaknesses in areas of attention

control, working memory and processing speed," but also as "a bright, creative child."  *Id.* at 47.

Based on this assessment, Creative Minds designed and issued an IEP for A.D. on February 10,

2016 ("2016 IEP").  *Id.* at 37. [3]

    The 2016 IEP provided A.D. with "one hour per week of specialized instruction outside

general education, 30 minutes per week for Behavioral Support Services, and 30 minutes per

week of occupational therapy."  *Id.* at 8-9.  Finding the 2016 IEP inadequate to meet their

daughter's needs, A.D.'s parents, at the beginning of the 2016-2017 school year, withdrew A.D.

from Creative Minds and matriculated her at the Lab School, a full-time "nonpublic specialized

program serving students with disabilities."  *Id.* at 83, 862.  On May 4, 2018, plaintiffs filed their

first due process complaint against both Creative Minds and the District, alleging that the 2016

IEP was insufficient and seeking tuition reimbursement for A.D.'s enrollment at the Lab School

during the 2016-2017 and 2017-2018 academic years.  *Id*. at 75, 78.  Since then, "litigation has

been sporadically ongoing in this Court against the District over the sufficiency of the 2016 IEP

and two subsequent IEPs issued by DCPS in December 2018 and November 2019."  *A.D. II*,

2021 WL 354175, at *2.

---

[2]     The tests administered during the January 2016 evaluation included subject matter-specific iterations of the Woodcock Johnson Achievement Tests and the Wechsler Intelligence Scale for Children.  AR at 37.

[3]     IDEA is administered by state education agencies ("SEAs") and local education agencies ("LEAs").  *See* 34 C.F.R. 300.608; *id.* § 300.200.  An SEA is responsible for general supervision and enforcement, *see* D.C. MUN. REGS. tit. 5, § 300.149, usually accomplished by apportioning and restricting funds, *see* 34 C.F.R. § 300.608.  An LEA is specifically responsible for providing a FAPE.  *See* D.C. MUN. REGS. tit. 5, § 3002.1.  In the District, a public charter school like Creative Minds may elect to be treated as an LEA for IDEA purposes.  *See* D.C. CODE § 38–1802.10(c); D.C. MUN. REGS. tit. 5–E, § 3019.2; *see also B.R. ex rel. v. District of Columbia*, 802 F. Supp. 2d 153, 160-161 (D.D.C. 2011).

On July 27, 2018, an administrative hearing officer issued a decision resolving plaintiffs'
due process complaint challenging the 2016 IEP. AR at 75. The hearing officer determined that
Creative Minds had "denied [A.D.] educational benefit, and therefore a FAPE, through its IEP
dated February 2016," *id*. at 90, but nevertheless did not award plaintiffs all their requested
relief: they were granted reimbursement for only half of the 2016-2017 Lab School tuition, rather
than their requested reimbursement for the entirety of both the 2016-2017 and 2017-2018
academic years. *Id.* at 94, 97. Specifically, reimbursement for the 2017-2018 school year was
denied because DCPS, not Creative Minds, was A.D.'s local education agency for that period
(during which she was already matriculated at the Lab School), *id.* at 93, while their requested
reimbursement award for 2016-2017 was reduced by half because plaintiffs failed to provide
proper notice to Creative Minds that A.D. was being withdrawn from the school. *See id.* at 95.

Plaintiffs appealed this July 2018 administrative decision, and on September 28, 2020,
another Judge on this Court adopted, over Creative Minds' objections, a Magistrate Judge's
Report and Recommendation, finding that (1) the 2016 IEP was inadequate under IDEA and (2)
plaintiffs had complied with IDEA's notice provisions and were thereby entitled to tuition
reimbursement for the entire 2016-2017 academic year. *See A.D. I*, 2020 WL 6373329, at *5-8.
Creative Minds was accordingly ordered to reimburse plaintiffs for their daughter's full tuition at
the Lab School during that academic year. *Id.* at *8.

### 2. *2018 IEP and Second Due Process Complaint*

During the summer of 2018, A.D.'s parents requested that DCPS conduct a new special
education eligibility evaluation for their daughter. AR at 100-101. DCPS thereafter agreed to
administer a renewed round of assessments to A.D., which included a cognitive psychological
evaluation, a social-emotional observation, occupational therapy, motivational rating scales, a

behavior scale measure, as well as a parent questionnaire.  *Id.* at 104.  In October 2018, a full

psychological evaluation determined that although A.D.'s intelligence was well within the

average range for children of her age, her lower level of academic performance was consistent

with a continued diagnosis of disability.  *Id.* at 122, 141. [4]  On November 28, 2018, DCPS

released a "Determination of Special Education Eligibility" finding that A.D. "continue[d] to

meet the eligibility criteria for special education and related services" due to her status as "a

student with a Multiple Disabilities (MD), encompassing a Specific Learning Disability and

Other Health Impairment (ADHD-Inattention)."  *Id.* at 178.  A new IEP was thereafter prepared

and issued by DCPS on December 5, 2018 ("2018 IEP").  This new IEP provided five hours per

week of specialized instruction outside general education; ten hours per week of specialized

instruction in general education; two hours per month of behavioral support services; and two

hours per year of occupational therapy consultation services, in addition to a series of specific,

measurable learning objectives.  *Id.* at 185, 197.

On April 22, 2019, plaintiffs filed a second due process complaint challenging the 2018

IEP and alleging the District failed to provide an adequate IEP and placement for the 2018-2019

school year and that the Lab School was an appropriate placement for A.D.  *Id.* at 242, 244.

Another decision issued by an administrative hearing officer on August 5, 2019 found in

plaintiffs' favor, concluding that the District had not met its burden of establishing that just five

hours per week of specialized instruction outside general education and ten hours per week of

specialized instruction within general education were "reasonably calculated to enable [A.D.] to

---

[4]      The October 2018 psychological evaluation included the following procedures and tests administrations:
Behavior Assessment Scale for Children-BASC-Parent; Behavior Assessment Scale for Children-BASC-Teacher; an
interview with A.D; an interview with A.D.'s parent; an interview with A.D.'s teacher; a review of A.D.'s PRO
forms, Health Certificate, Learning Profile, report card, and the previous due process complaint; the Wechsler
Intelligence Scale for Children-Fifth Edition; and the Woodcock Johnson Tests of Achievement-Fourth Edition.  *See*
AR at 123.

make appropriate progress in [A.D.'s] circumstances," and that the Lab School remained an

appropriate placement. *Id.* at 257, 261. Consistent with these findings, DCPS was ordered to

reimburse plaintiffs for tuition and related services at the Lab School for the entire 2018-2019

school year, for the first half of the 2019-2020 school year, and "until a FAPE is offered by

DCPS." *Id.* at 262.

### 3. *2019 IEP and Third Due Process Complaint*

On November 25, 2019, DCPS convened a meeting to update A.D.'s IEP, the sufficiency

of which is disputed in the pending motions. To determine the proposed level of special

education services for A.D. moving forward, DCPS examined A.D.'s 2019 Lab School progress

reports, teacher interviews, teacher reports, an IEP prepared by the Lab School, and A.D.'s

Spring and Fall 2019 standardized assessment results. *Id.* at 269, 271-281. The DCPS team

charged with developing this updated IEP also considered A.D.'s performance on the Woodcock

Johnson Test of Achievements, in which she scored in the "average" range in reading and written

language, and in the "low average" range in math. *Id.* at 288. At the IEP meeting, plaintiffs

stated that A.D. required a full-time special educational placement *entirely outside* the general

education system. *Id.* at 823-824. DCPS also noted during this meeting that only two out of six

of A.D.'s current teachers at the Lab School were special educators. *Id.* at 298.

The IEP issued in November 2019 ("2019 IEP") provided A.D. with the most special

education support of any IEP to date, prescribing twenty hours per week of specialized

instruction outside general education; three hours per month of behavioral support services; two

hours per month of occupational therapy services; and thirty minutes per month of occupational

therapy consultation services, in addition to classroom accommodations and specified learning

goals. *Id.* at 266, 282, 283, 285. Under this plan, A.D. would complete all her core curriculum

classes within the twenty hours per week allocated for "specialized instruction outside general education," while her participation in electives would take place in a general education setting along with non-disabled peers. *See id.* at 298. For implementation of the 2019 IEP, DCPS recommended A.D.'s placement at her neighborhood school, Roosevelt High School ("Roosevelt"), a public high school in the District's Northwest quadrant. *Id.* at 328. Subsequently, A.D.'s mother and an educational consultant toured Roosevelt, where staff members discussed possible implementations of A.D.'s 2019 IEP and responded to queries about the school and its ability to meet A.D.'s needs. *Id.* at 302-303. A.D.'s mother was informed during this visit that, at Roosevelt, A.D. would be able to access a social worker on each floor, a sensory room, an iPad, a case manager, and alternative quiet spaces during recess and lunch. *Id.*

As preamble to the instant litigation, on May 5, 2020, plaintiffs filed a third administrative due process complaint alleging that the 2019 IEP and proposed placement at Roosevelt were inappropriate for A.D. and seeking relief in the form of tuition and related services reimbursement for the second semester of the 2019-2020 school year, as well as a declaration that the Lab School would remain A.D.'s placement for the following academic year. *Id.* at 330, 344. [5]

### 4. *August 2020 Hearing and Challenged September 2020 Hearing Officer Determination on Third Due Process Complaint*

On August 18 and August 31, 2020, an administrative due process hearing was held to consider plaintiffs' complaint challenging the 2019 IEP and A.D.'s proposed placement at Roosevelt. *Id.* at 790, 968. During this hearing, the hearing officer received testimony from five

---

[5]     In this complaint, plaintiffs also claimed that DCPS had denied A.D. a FAPE by failing to confirm a time for A.D.'s father to tour Roosevelt and observe the proposed educational placement site for implementation of the 2019 IEP, but plaintiffs withdrew this claim during the August 2020 administrative hearing. AR at 344, 971-972.

DCPS witnesses and four witnesses put forward by plaintiffs.  *See id.* at 810, 859, 901, 934, 975, 1002, 1084, 1118, 1057.

Among DCPS' witnesses was Shirley Hodges, a licensed school psychologist who observed A.D. at the Lab School, *id.* at 975, 977, and assessed her using three separate special needs assessments, *id.* at 979.  Hodges testified that A.D.'s test results showed that, while she had "challenges with . . . distractibility," she was nevertheless "easily redirected" and "a bright young lady," *id.* at 980, who "would be able to access the general curriculum," *id.* at 982. Jessica Robinson, another DCPS witness and a representative from Roosevelt, testified that at the November 2019 IEP meeting, "there were no disagreements" between DCPS and A.D.'s parents concerning A.D.'s present levels of academic performance detailed in the proposed IEP plan, *id.* at 1088, and that DCPS "pretty much accepted all of [A.D.'s parents'] feedback" when creating her 2019 IEP goals, *id.* at 1091.[6]  Robinson further explained that the 2019 IEP increased A.D.'s total hours of specialized instruction outside general education to twenty hours due to the anticipated challenges of transitioning to a new school "and because [A.D.'s] mom did speak to having a lot of concerns about [A.D.] dealing with organization," *id.* at 1094, although this allocation of special education hours was still less than the "full-time special education placement" requested by plaintiffs, *see id.* at 842.  Robinson also testified that she accompanied A.D.'s mother in her visit to Roosevelt, during which all of plaintiff's questions were answered by a school official.  *Id.* at 1104.

---

[6]     The only modification requested by A.D.'s parents to the portion of the 2019 IEP discussing their daughter's present levels of academic performance was not substantive and merely sought to change the term "IEP" to "ILP," or "Individualized Learning Plan," as used throughout that section of the document.  *See* AR at 1089 ("The only change that they asked was to change the word IEP to ILP in the PLOPs, but that was all as far as the present levels was concerned.").  DCPS agreed to this change.  *Id.*

The hearing officer likewise heard testimony from DCPS witness Devon Wade, Roosevelt's Director of Specialized Instruction, who testified generally as to the school's resources and the specific program in which A.D. would be enrolled. *Id.* at 1121 (noting that each specialized instruction class under A.D.'s program would enroll a "maximum of 15 students with one special education teacher and a[n] instructional assistant"); *see id.* at 1118-20, 1128, 1130. DCPS presented additional testimony from an expert in special education and placement, Nicole Manuel, who attended the November 2019 IEP meeting in her capacity as DCPS' general education specialist. *Id.* at 1004. According to Manuel, during the 2019 IEP meeting, plaintiffs agreed on all accommodations and classroom aids outlined in the 2019 IEP and the sole disagreement between plaintiffs and the District on these points regarded the number of hours of special education services that A.D. would receive under the plan: plaintiffs requested "full time" special education services, whereas DCPS determined that only twenty hours per week of such services, outside general education, were necessary. *See id.* at 1009-12.

Manuel also testified about Roosevelt's delivery of A.D.'s special needs instruction, explaining that all special education would occur in a "small environment" with a 12:2 student-to-educator ratio and taught by a certified special educator. *Id.* at 1012, 1014. Manuel further stated that, under the 2019 IEP, A.D.'s elective classes would be held with non-disabled peers, which the District considered an asset to her social development. *Id.* at 1013. Manuel specifically noted that, because A.D. is a "student who has aspirations of being a doctor," it was important for her "success in the future" to also spend "as much as possible" time in a general educational setting along with her "typically developing peers." *Id.* Lastly, the hearing officer considered testimony from DCPS expert in occupational therapy programing, Veronique Moise, who had also attended the November 2019 IEP meeting, assessed A.D. for therapy services,

interviewed her parents, and observed A.D. in the classroom. *Id.* at 1057-59.  Moise's testimony emphasized that occupational therapy services could be successfully provided to A.D. in both special and general education classes.  *Id.* at 1070.

For their part, plaintiffs presented four witnesses before the hearing officer.  A.D.'s educational consultant, Amy Mounce, stated that during the November 2019 IEP meeting she advocated for a full-time special educational placement for A.D.  *Id.* at 810, 842.  When asked how she justified her request for a full-time special education placement during the IEP meeting, however, Mounce testified that she "did not give a specific number" but simply stated that A.D. "needs the full-time special education placement" based on her "executive functioning and her anxiety and how that impacts her."  *Id.* at 842.  Mounce confirmed that none of plaintiffs' representatives at the IEP meeting offered data to support their request that A.D. be placed in a special education program full-time rather than the twenty hours of specialized instruction proposed by DCPS.  *See id.* at 852.

Plaintiffs also introduced testimony from Dr. Douglass Fagen, director of the Psychology Department at the Lab School.  Fagen testified that the Lab School's small class sizes and education by trained special educators were "key components for [A.D.'s] success," *id.* at 901, 916; that, although A.D. had elevated diagnostic scores for anxiety and depression, these scores were not severe enough to classify A.D. as "emotionally disturbed," *id.* at 923; and that he was primarily concerned about A.D.'s low math scores, *id.*  Christopher Lanier, the Associate Head of the High School at the Lab School, *id.* at 859, likewise testified for plaintiffs that A.D. was a "bright student" who, despite a "difficult transition to the high school," had made "steady progress."  *Id.* at 863-864.  Lanier noted that A.D.'s difficulties transitioning to high school primarily stemmed from the shift to online classes due to the COVID-19 pandemic.  *See id.* at

867.  A.D.'s mother was plaintiffs' final witness during the August 2020 due process hearing. *Id.* at 934.  She testified that the input she provided during the November 2019 IEP meeting directly resulted in several changes to the learning goals included in A.D.'s 2019 IEP and that the 2019 IEP was designed via a "collaborative process" between her and DCPS.  *See id.* at 941.

On September 8, 2020, the hearing officer issued a 20-page decision upholding the adequacy of the 2019 IEP and dismissing plaintiffs' complaint.  *Id.* at 4-23 (Sept. 8, 2020 Hearing Officer Decision ("2020 HOD" or "challenged HOD")).  Following a meticulous examination of A.D.'s most recent academic performance and psychological assessments, the 2019 IEP, and testimony presented during the August 2020 hearing, *see id.* at 14-15, 17, 20, the hearing officer concluded that A.D.'s "academic deficits would not support a full-time" special education placement because, despite her educational disabilities, she was "capable of average range achievement scores and above average grades."  *Id.* at 22.  In addition, the hearing officer found that "the record [did] not support" the "level of restriction" represented by full-time special education since A.D.'s "stress, anxiety, and inattentiveness" were not "so severe" that she could not progress without a full-time program.  *Id.* (also noting that "the evaluations in the record do not report psychological problems that would prevent [A.D.] from adjusting to a new and more robust environment at" Roosevelt).  The hearing officer further found that, "with support, [A.D.] makes steady academic progress" and emphasized that the 2019 IEP provided A.D. with "a significant amount of small-class and individual support," primarily effectuated through the significant allocation of twenty hours per week of specialized instruction outside of general education—the most of such specialized instruction hours proposed in any of her IEPs to date.  *Id.*

13

Accordingly, the hearing officer concluded that plaintiffs' request of a full-time special education placement for A.D. would violate IDEA's "central tenet" that children with disabilities be provided an education, to "the maximum extent appropriate," in the least restrictive environment together "with children who are not disabled," *id.* (quoting 20 U.S.C. § 1412(a)(5)(A)), for which the 2019 IEP—proposing that electives and other programming be completed within the general curriculum—offered A.D. "an appropriate program and placement," *id.* at 23.

### C.  Procedural Background

Three weeks after issuance of the 2020 HOD, plaintiffs, on September 29, 2020, commenced this action challenging the hearing officer's decision to uphold the 2019 IEP.  *See generally* Compl., ECF No. 1.  Plaintiffs request injunctive relief requiring the District to provide reimbursement for A.D.'s tuition and related services incurred at the Lab School from the second semester of the 2019-2020 school year to the present and an order declaring the Lab School as A.D.'s current educational placement, in addition to attorneys' fees and any other relief deemed proper by the Court.  *Id.* at 17.

On December 16, 2020, plaintiffs—asserting their rights under IDEA's "stay-put" provision, 20 U.S.C § 1415(j)—moved for a preliminary injunction seeking to maintain A.D.'s placement at the Lab School for the duration of the instant appeal, as well as both retroactive and prospective tuition reimbursement for the Lab School beginning at the start of the 2020-2021 school year.  *See* Pls.' Mot. for Prelim. Inj. at 1, 11, ECF No. 8.  On February 2, 2021, this Court granted that preliminary injunction, pursuant to which the District was directed to maintain A.D.'s placement at the Lab School and to "fund all costs" related to A.D.'s instruction in that institution "retroactive to the start of the 2020-21 school year" and "until further order of this

Court." Order (Feb. 2, 2021), ECF No. 12. Briefing on the parties' pending cross-motions for summary judgment was completed in late September 2021 after several extensions to the briefing schedule requested by the parties. *See* Min. Orders (June 10, 2021 & July 27, 2021). This matter is now ripe for resolution.

## II.     LEGAL STANDARD

IDEA guarantees "all children with disabilities . . . a free appropriate public education [("FAPE")] that emphasizes special education and related services designed to meet their unique needs." 20 U.S.C. § 1400(d)(1)(A). Among the "various procedural safeguards" provided in the IDEA to "guarantee parents both an opportunity for meaningful input into all decisions affecting their child's education and the right to seek review of any decision they think inappropriate," *District of Columbia v. Doe*, 611 F.3d 888, 890 (D.C. Cir. 2010) (quoting *Honig v. Doe*, 484 U.S. 305, 311-312 (1988)), is the right to a due process hearing held before a hearing officer, *see* 20 U.S.C. § 1415(c). Any party aggrieved by a decision of a hearing officer under IDEA may appeal that decision to any state court or a United States district court. *Id.* § 1415(i)(2).

The party challenging an administrative decision has the burden of proving deficiencies in that decision by a preponderance of the evidence. 20 U.S.C. § 1415(i)(2)(C)(iii). When evaluating the appeal of a hearing officer's decision, a court "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C). The court must resolve factual disputes based upon its own *de novo* review of the record and evaluation of the preponderance of the evidence, giving "due weight" to the findings of the IDEA hearing officer, depending on the thoroughness and reasonableness of the administrative proceedings. *See Bd. of Educ. of*

*Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 206 (1982); *Doe*, 611 F.3d at 897. This evaluation of the evidence, however, is "by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." *Rowley*, 458 U.S. at 206. At bottom, an IEP's adequacy thus "turns on the unique circumstances of the child for whom it was created," and a reviewing court should defer to school authorities when they "offer a cogent and responsive explanation" showing that an IEP "is reasonably calculated to enable the child to make progress appropriate in light of [her] circumstances." *Endrew F.*, 137 S. Ct. at 1001-02.

## III.    DISCUSSION

Plaintiffs identify an assortment of defects in the 2020 HOD to support their contention that the 2019 IEP denied A.D. a FAPE, in violation of IDEA, for the second half of the 2019-2020 academic year. Among other things, plaintiffs assert that the hearing officer "completely misunderstood the issue before him" and failed to analyze whether the 2019 IEP provided a FAPE to A.D., Pls.' Mem. at 14-15; "failed to weigh any of the evidence before him[] or explain why he was choosing to not rely upon the opinions of the parents' witnesses," *id.* at 20; and failed to consider that A.D.'s parents were denied "meaningful participation in the placement process," *id.* at 30. The District rejects these critiques, pointing out the hearing officer's comprehensive examination of the record evidence and highlighting that plaintiffs' only substantive disagreement with the 2019 IEP was about "the hours of specialized instruction it provided." Def.'s Mem. at 20. Finding no error in the hearing officer's determination that the 2019 IEP "was reasonably calculated to enable" A.D. "to make progress appropriate in light of [her] circumstances," *Endrew F.*, 137 S. Ct. at 1002, plaintiffs' motion for summary judgment must be denied and the District's cross-motion granted.

## A.  Challenged HOD Properly Evaluated the 2019 IEP

Plaintiffs first assert that the 2020 HOD is incorrect and "entitled to no deference," Pls.'
Mem. at 15, because the hearing officer erred by conceptualizing the central issue before him as
whether A.D. "required placement in a full-time special education setting," *id.* at 14-15.  As
plaintiffs read the challenged HOD, after initially describing the key issue presented in plaintiffs'
due process complaint as "[w]hether DCPS denied [A.D.] a FAPE by failing to provide an
appropriate IEP and placement for the second semester of the 2019-20 school year," *id.* at 14
(quoting AR at 6), the hearing officer subsequently stated as part of his analysis that the
"question in this case is simply whether Student must be educated in a small class environment
completely separated from general education peers," *id.* (quoting AR at 20).  This latter
description of the "question" means, in plaintiffs' view, that the hearing officer failed properly to
analyze whether the 2019 "IEP provided A.D. a free appropriate public education," *id.* at 15, and
thus "completely missed what he was supposed to do in the administrative due process hearing,"
Pls.' Opp'n to Def.'s Cross-Mot. for Summ. J. and Reply to Def.'s Opp'n to Pls.' Mot. for
Summ. J. ("Pls.' Opp'n"), at 2, ECF No. 23.  This argument seeks to manufacture error in the
challenged HOD out of whole cloth.

IDEA requires that disabled children be educated "to the maximum extent appropriate . . .
with children who are not disabled," in what, as noted above, is referred to as a disabled child's
"least restrictive environment."  20 U.S.C. § 1412(a)(5)(A).  The statute specifically instructs
that "removal of children with disabilities from the regular educational environment" should
occur "only when the nature or severity of the disability of a child is such that education in
regular classes with the use of supplementary aids and services cannot be achieved
satisfactorily."  *Id.*  In developing an IEP, the Supreme Court has explained that IDEA's mandate

to place a disabled student in their least restrictive environment must be balanced with the requirement that an IEP be "reasonably calculated to enable a child to make progress appropriate in light of [their] circumstances." *Endrew F.*, 137 S. Ct. at 999, 1101.

Contrary to plaintiffs' assertions, the challenged HOD's framing of the central issue as whether A.D. "must be educated in a small class environment completely separated from general education peers" demonstrates keen attention to both the administrative record and IDEA's maxim that disabled children be educated in the least restrictive environment along with non-disabled peers. *See* 20 U.S.C. § 1412(a)(5)(A).

As the District correctly points out, the challenged HOD framed the issue in these terms since "the only objection Plaintiffs had with [the 2019] IEP" was whether "A.D. could be educated in a program that included classes, lunch, and break time with non-disabled peers." Def.'s Mem. at 20-21; *see also* Def.'s Reply to Pls.' Opp'n to Def.'s Mot. for Summ. J ("Def.'s Reply"), at 2, ECF No. 25.  The 2019 IEP provided A.D. with twenty hours per week of specialized instruction outside general education devoted to her core curriculum but envisioned that A.D. would participate in electives and other school activities in a general education setting. AR at 847-848.  A.D.'s parents, however, disagreed with this aspect of the IEP and insisted that A.D. be provided *full-time* special instruction outside general education.  *Id.* at 822-823.  The "lack of full-time services outside of general education" was the "only significant objection" raised by plaintiffs about the 2019 IEP, AR at 20; *see also id.* at 822-823, and the parties otherwise agreed about A.D.'s levels of academic performance, educational goals, classroom aids and accommodations, as well as the amount of behavioral support, occupational therapy, and consultation services provided in the 2019 IEP.  *See id.* at 822, 852-53, 1009-11, 1019-20, 1026-27, 1088, 1092, 1099-1100.  Rather than demonstrating any failure to resolve the main

inquiry, as plaintiffs protest, the challenged HOD's more tailored framing of the issue instead reflects an understanding of the flashpoint animating the parties' dispute over the 2019 IEP: whether A.D. could be partially educated with non-disabled peers (as DCPS concluded) or whether she required a full-time placement in specialized instruction (as her parents requested).

In any event, the challenged HOD contains a full assessment of the adequacy of the 2019 IEP and ample evidence supports the conclusion reached that the IEP satisfied IDEA's requirements. *Contra* Pls.' Opp'n at 2 (arguing that the hearing officer "completely missed what he was supposed to do in the administrative due process hearing"). As a threshold matter, the hearing officer examined A.D.'s recent academic performance, noting it "is roughly average as compared to . . . her same-aged peers," and found that, because she is capable of average range achievement scores and above average grades, her "academic deficits would not support a full-time IEP." AR at 21-22. The hearing officer next considered A.D.'s "social/emotional[] anxiety, inattentiveness, and other psychological disabilities." *Id.* at 22. He specifically noted that A.D. "suffers from anxiety, stress, inattentiveness," and that she "struggles with developing relationships with peers." *Id.* at 22. The hearing officer acknowledged evidence that, when overwhelmed, A.D. "may withdraw, avoid academic tasks, and on occasion . . . leave the classroom." *Id.* Despite these challenges, the hearing officer also recounted that A.D. "interacts eagerly and well with adults;" "is not reported to pose disciplinary problems;" "does not disturb other children;" "is not aggressive;" "participates in group and individual activities;" and "does not routinely act out." *Id.* Considered altogether, the hearing officer concluded that no aspect of A.D.'s psychological profile suggests she "cannot progress without a full-time program." *Id.*

Based on the foregoing assessment of the record evidence, the hearing officer determined that A.D. could continue achieving "steady academic progress" with the "significant amount of

small-class and individual support" consisting of twenty hours per week of specialized instructions plus additional resources outlined in the 2019 IEP, and that plaintiffs' proposed placement of A.D. in a full-time special education program would violate IDEA's "central tenet" that disabled students be educated in the least restrictive environment along with non-disabled peers. *Id.* These considerations amply support the hearing officer's finding that the 2019 IEP offered A.D. "an appropriate program and placement" under IDEA. *Id.* at 22-23. Plaintiffs' argument that the hearing officer "completely failed to address whether the proposed DCPS IEP provided A.D. the free appropriate education to which she is entitled," Pls.' Opp'n at 3, therefore ignores the comprehensive discussion provided in the challenged HOD of this very issue.

Straining to undermine the conclusion reached in the challenged HOD about the adequacy of the 2019 IEP, plaintiffs throw up related arguments that the hearing officer misapplied the burden of proof and "presumption of continuity," Pls.' Mem. at 16-20, and that he failed to consider the "extent" and "uniqueness" of A.D.'s needs, *id.* at 26, but none of these arguments is persuasive. First, as to burden of proof, plaintiffs argue that although the "Hearing Officer properly noted that DCPS held the burden of proof . . . there is no indication that he *actually* applied this burden to DCPS as he considered the evidence before him." *Id.* at 16 (emphasis in original); *see also* Pls.' Opp'n at 3 ("[T]he Hearing Officer failed to explain how he applied his analysis or how the school system met its burden."). Ordinarily, the "burden of proof in an administrative hearing challenging an IEP is properly placed upon the party seeking relief," *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 62 (2005), but under District law, this burden is shifted to DCPS to demonstrate "the appropriateness of the existing or proposed program or placement" where, as here, "there is a dispute about the appropriateness of the child's [IEP] or placement," D.C. Code § 38-2571.03(6)(A)(i). As already detailed *supra,* in Parts I.B.4 and

III.A, the hearing officer concluded the 2019 IEP was appropriate based on his analysis of the record evidence, which consisted of testimony from plaintiff and District witnesses, "A.D.'s grades, scores on standardized tests . . . general academic progress, the conclusions of the psychological evaluation, and the provisions of the proposed IEP and placement."  Def.'s Reply at 3; *see also* AR at 20-23.  Thus, consistent with the District's burden of proof, the hearing officer adequately explained his determination that A.D.'s least restrictive environment was the "20 hours of specialized instruction with related services, classroom aids, supports, and accommodations" provided in the 2019 IEP.  Def.'s Mem. at 22.

Next, relying on *Andersen v. District of Columbia*, 877 F.2d 1018 (D.C. Cir. 1989), plaintiffs argue that "[t]here should have been a presumption of continuity here with the prior [August 2019] Hearing Officer's Decision that Lab School is A.D.'s least restrictive environment and is appropriate for her."  Pls.' Mem. at 19; *see also* AR at 257, 261-262 (August 2019 administrative decision ordering the District to cover A.D.'s Lab School tuition for the 2018-2019 academic year and first semester of 2019-2020, and finding that 2018 IEP only requiring *five* hours per week of specialized instruction outside general education was insufficient to provide A.D. with a FAPE).  In *Andersen*, the D.C. Circuit considered a request that DCPS continue covering private school tuition in the years "following the ones directly relevant to the litigation" because DCPS had failed to prepare updated IEPs for those subsequent years.  877 F.2d at 1022.  The D.C. Circuit noted that, absent updated IEPs or other evidence that a child's circumstances have changed during the pendency of litigation, "any placement that was appropriate for him in the initial year would continue to meet his educational needs in succeeding years"—a "presumption of continuity" that "seem[ed] most practical" as a guidepost for fashioning appropriate relief when a "court is faced with a mere hypothesis of what the

school district would have proposed and effectuated during the subsequent years." *Id.* (citations

omitted).  No such "presumption of continuity" is appropriate here, however, since the 2019 IEP

was developed after issuance of the August 2019 administrative decision and this Court's sole

task in this lawsuit is to determine whether the 2019 IEP provided a FAPE to A.D. for the second

semester of the 2019-2020 school year.  *See* Pls.' Mem. at 1; Compl. at 17.

      Lastly, plaintiffs' argument that the hearing officer did not consider A.D.'s unique and

specific circumstances, *see* Pls.' Mem. at 26-30, is likewise to no avail.  The 2020 HOD makes

plain that the hearing officer examined the totality of A.D.'s most recent academic and

behavioral profile, including her distinct psychological challenges, before concluding that her

needs could be met without a full-time special education placement.  *See* AR at 22 (finding,

based on the record evidence, that A.D.'s disabilities would not prevent her from accessing a

general curriculum when provided with substantial support as contemplated in the 2019 IEP).

      Accordingly, contrary to plaintiffs' extended critique, the challenged HOD amply

supports the conclusion that the District met its burden of proving that the 2019 IEP provided

A.D. an appropriate program and placement.

### B.  Challenged HOD Reflects Proper Weighing of Record Evidence

      Plaintiffs also argue that the hearing officer "failed to weigh any of the evidence before

him, or explain why he was choosing to not rely upon the opinions of the parents' witnesses."

Pls.' Mem. at 20; *see also* Pls.' Opp'n at 4 ("[T]he Hearing Officer consistently erred in his

credibility determinations, relying upon the opinions of the school system witnesses, while

failing to acknowledge their lack of explanation for A.D.'s placement recommendations and

failing to weigh the evidence before him.").[7]  Here again, plaintiffs' assertions are wholly

unfounded.

It is undisputed that "the hearing officer is best positioned to make credibility judgments

as to testifying witnesses and resolve factual disputes that amount to inconsistent testimony."

*J.T. v. District of Columbia*, 496 F. Supp. 3d 190, 207 (D.D.C. 2020).  For this reason, "courts

sitting on an IDEA appeal do not have unfettered review, but must give due weight to the

administrative proceedings and afford some deference to the expertise of the hearing officer and

school officials responsible for the child's education."  *Gill v. District of Columbia*, 751 F. Supp.

2d 104, 108-109 (D.D.C. 2010) (cleaned up); *see also J.T. v. District of Columbia*, No. 20-7105,

2022 WL 126707, at *2 (D.C. Cir. Jan. 11, 2022) ("[W]e must give 'due weight' due to hearing

officer's credibility determinations") (quoting *Rowley*, 458 U.S. at 206).

The challenged HOD makes evident that the hearing officer weighed the witness

testimony and other evidence offered by the parties.  For example, the hearing officer weighed

the Psychotherapy Report prepared by Lorraine Simon, A.D.'s psychologist at the Lab School,

against the Psychological Evaluation of DCPS witness Shirley Hodges, also a psychologist.  AR

at 22.  Simon's report recommended A.D.'s continued placement at the Lab School, whereas

---

[7]       Together with their argument regarding the hearing officer's alleged failure properly to weigh the evidence, plaintiffs contend that the hearing officer "failed to even address the school system's responsibility to provide a cogent and responsive explanation for A.D.'s proposed IEP and placement." Pls.' Mem. at 20.  This argument, too, is unpersuasive.  The hearing officer had no reason to address this issue because the record evidence establishes that DCPS *did* provide "a cogent and responsive explanation" showing the 2019 IEP was "reasonably calculated to enable [A.D.] to make progress in light of [her] circumstances." *Endrew F.*, 137 S. Ct. at 1002.  As just one example:  DCPS witness Jessica Robinson, who drafted the 2019 IEP, testified that the amount of specialized instruction outside general education in A.D.'s IEP was increased from five to twenty hours between the 2018 and 2019 IEPs given her difficulties transitioning to high school and need for additional support.  *See* AR at 1094; *see also id.* at 979, 982, 987-988 (testimony of DCPS psychologist Shirley Hodges stating that A.D. did not require a full-time special education placement based on her academic and behavioral profiles); *id.* at 1013 (testimony of DCPS general education specialist Nicole Manuel noting that, as a student with aspirations of becoming a doctor, A.D. would benefit from spending time in a general education setting as contemplated in the 2019 IEP).  Record evidence thus demonstrates the 2019 IEP was tailored to "the unique circumstances of the child for whom it was created." *Endrew F.*, 137 S. Ct. at 1001.

Hodges's evaluation did not suggest that A.D.'s "stress, anxiety, and inattentiveness are so severe that [she] cannot progress without a full-time program." *Id.*  Finding that Hodges's evaluation was supported by other evidence as to how A.D. "overcame difficulties transitioning to high school," the hearing officer concluded that "the evaluations in the record do not report psychological problems that would prevent [A.D.] from adjusting to a new and more robust environment at" Roosevelt.  *Id.* (further noting that "[n]othing in [Hodges's] evaluation or [Simon's] Psychotherapy Report indicates any harm that [A.D.] would suffer by interacting with nondisabled peers"); *see also id.* at 863-864, 867 (testimony from plaintiffs' witness Christopher Lanier stating that A.D. was a "bright student" who had made "steady progress" after a difficult transition to high school primarily stemming from the shift to online learning during the COVID-19 pandemic).

The hearing officer likewise accounted for the testimony of A.D.'s mother and her educational advocate, Amy Mounce, conveying that A.D. "must be separated from nondisabled peers throughout the school day due to deficits in executive functioning, inattentiveness, anxiety, difficulty with transitions" and because she "may leave the classroom if . . . frustrated or overwhelmed."  *Id.* at 20; *see id.* at 22 ("[A.D.] suffers from anxiety, stress, inattentiveness . . . struggles with developing relationships with peers and is uncomfortable in crowds.").  This testimony was weighed by the hearing officer against other evidence establishing that A.D. does not "pose disciplinary problems . . . does not disturb other children, is not aggressive, . . . participates in group and individual activities [and] does not routinely act out."  *Id.* at 22; *see also id.* at 842, 852 (testimony from Amy Mounce explaining that plaintiffs' request for a full-time special education placement was not based on any data but simply upon A.D.'s "executive functioning and her anxiety and how that impacts her").  Against this backdrop, the hearing

officer concluded that A.D.'s anxiety is not severe enough as to prevent her from continuing to make progress with the services prescribed in the 2019 IEP.  *Id.*

The hearing officer's conclusion that, "with support," A.D. "makes steady academic progress" is similarly supported by the evidentiary record and witness testimony.  *Id.*  Indeed, two of plaintiffs' witnesses testified to that effect.  Douglass Fagen, director of the Psychology Department at the Lab School, explained that small class sizes and instruction from special educators were "key" for A.D.'s success, *id.* at 901, while Christopher Lanier, a Lab School administrator, testified that A.D. had made "steady progress" after a challenging transition to high school, *id.* at 863-864.  On this basis, the hearing officer determined that "just as [A.D.] overcame difficulties transitioning to high school at" the Lab School, she would be able to continue making "steady academic progress" with the "significant amount of small-class and individual support" of twenty hours per week of specialized instruction outside general education, 45 minutes per week of behavioral support services, and 30 minutes per week of occupational therapy services provided in the 2019 IEP.  *Id.* at 22.  Plaintiffs insist that their "witnesses clearly merited significantly more weight and deference" simply because of their proximity to A.D., *see* Pls.' Mem. at 22, but even plaintiffs do not go so far as to demand that these witnesses' views dictate the result.  Here, the challenged HOD reflects that the opinions and observations of plaintiffs' witnesses were considered, *see, e.g.*, AR at 20, and the hearing officer reached reasonable conclusions based on the totality of the record before him, including the testimony of both parties' witnesses.  *See S.M. v. District of Columbia*, No. 19-2096 (RC), 2020 WL 7230266, at *5 (D.D.C. Dec. 8, 2020).

### C.  Plaintiffs Meaningfully Participated in the IEP Process

Finally, plaintiffs allege error based on DCPS' purported failure to allow A.D.'s parents to participate in the IEP process and the hearing officer's failure to consider that denial.  *See* Pls.' Mem. at 30-34; Pls.' Opp'n at 9-10.  Procedural inadequacies "significantly imped[ing] the parents' opportunity to participate in the decisionmaking process regarding the provision of a free appropriate education" may amount to a violation of IDEA.  20 U.S.C. § 1415 (f)(3)(E)(ii).  While plaintiffs are correct that parental involvement in the IEP process is central to the statutory scheme, *see Rowley*, 458 U.S. at 205; *Endrew F.*, 137 S. Ct. at 999; *see also* Pls.' Mem. at 31, they incorrectly conflate participation with acquiescence to all their requests.

First, plaintiffs had substantial opportunity to participate—and did participate—in the November 2019 IEP meeting.  *See Paolella ex rel. Paolella v. District of Columbia*, 210 Fed. Appx. 1, 3 (D.C. Cir. 2006) (determining that parental involvement in the IEP-development process indicated meaningful participation such that there was no denial of a FAPE).  The record reflects that A.D.'s parents and seven of their representatives, including their counsel, attended the November 2019 IEP meeting, during which they were able to provide feedback about DCPS' proposals and voice their concerns to DCPS staff.  *See* AR at 293-299.  For instance, the meeting notes document that A.D.'s mother conveyed to DCPS representatives that, although she was now "doing well," A.D.'s "transition to high school was a little rough" and that "[s]he really needs [occupational therapy] to manage transition to high school."  *Id.* at 294.  Occupational therapy services were subsequently added to the IEP based on this feedback.  *See id.* at 299.  Another comment by A.D.'s mother is also reflected in a discussion of the 2019 IEP's annual goals for math, *id.* at 295, and she later testified that during the IEP meeting "we tweaked a lot of the goals . . particularly a lot of the math goals," *id.* at 941; *see also id.* (agreeing with

description of "going through and tweaking" A.D.'s IEP goals as a "collaborative process"). In addition, the meeting notes state that Roosevelt was identified as a possible implementation site for A.D.'s new IEP and that A.D.'s parents would receive follow up via email and could "go in and see and talk to [the] school at any time." *Id.* at 299.

Second, plaintiffs enjoyed substantial participation in the form of a guided visit to Roosevelt. On December 18, 2019, A.D.'s mother and Amy Mounce, A.D.'s educational consultant, toured the Roosevelt campus, an opportunity that offered plaintiffs firsthand exposure to the educational environment in which DCPS proposed to place A.D. and to ask questions about the school. After expressing concerns about A.D.'s transition to a new environment, for example, plaintiffs were advised by a Roosevelt representative that A.D. "would have support from the staff" and access to a social worker on each floor of the school. *Id.* at 302; *see also id.* at 303 (noting that A.D.'s mother also expressed concerns to Roosevelt staff about "A.D. not being able to have her cell phone on her at all times or direct access to it" and A.D.'s possible sensitivity to the loud ringing of the school's bells). Plaintiffs protest that, following this visit to Roosevelt, they were unable "to discuss these concerns with DCPS at another meeting." Pls.' Mem. at 32. No such follow-up meeting, however, is required to be convened under IDEA to effectuate the substantial participation in the IEP process that A.D.'s parents were entitled to. *See* D.C. Code § 38-2571.03(5) (only providing that a parent or the parent's designee shall have an opportunity to observe the proposed special education program); *see also James v. District of Columbia*, 949 F. Supp. 2d 134, 138 (D.D.C. 2013) ("While the IDEA requires a student's parents to be part of the team that creates the IEP and determines the educational placement of the child, it does not 'explicitly require parental participation in site selection.'") (*citing White ex rel. White v. Ascension Parish Sch. Bd.*, 343 F. 3d 373, 379 (5th Cir. 2003)). The record thus

shows that plaintiffs enjoyed ample participation in the development process of the 2019 IEP, as required, and within the parameters set, by the statute.

***

In sum, plaintiffs have failed to demonstrate, by a preponderance of the evidence, that the hearing officer erred in deciding the 2019 IEP offered an appropriate placement and program for A.D.  Although the Lab School ostensibly "offers a more intensive program than DCPS" at least as to specialized education services, *see* AR at 22, at issue "is whether the IEP is *reasonable*, not whether the court regards it as ideal," *Endrew*, 137 S. Ct. at 999 (emphasis in original), and IDEA appeals do not provide courts with "an invitation to . . . substitute their own notions of sound educational policy for those of the school authorities which they review," *id.* at 1001 (citations omitted).  By any means, the 2019 IEP—prescribing twenty weekly hours of specialized instruction in the core curriculum and contemplating participation in electives and other school activities among the general student population—was reasonable and aimed to enable A.D. to continue making progress in her high school journey.  *See id.* at 999.

## IV.    CONCLUSION

For the foregoing reasons, plaintiffs' motion for summary judgment, ECF No. 18, is DENIED, and the District's cross-motion, ECF No. 20, is GRANTED.  An order consistent with this Memorandum Opinion will be filed contemporaneously.

Date: March 8, 2022

_____
BERYL A. HOWELL
Chief Judge